## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:20-cv-02366-HLT** |
| **SUPERIOR PRODUCTS INTERNATIONAL II, INC., and JOSEPH E. PRITCHETT,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiff Federal Trade Commission brings this enforcement action against Defendants Superior Product International II, Inc. ("SPI") and its president and CEO Joseph E. Pritchett. Defendants market and sell Super Therm® and Sunshield. Defendants claim these products provide energy efficiencies when applied like paint to businesses and homes by resisting heat flow and blocking heat gain. Plaintiff alleges Defendants marketed these products with deceptive R-value and energy-saving claims that violate the Federal Trade Commission Act ("FTC Act").[1]

Plaintiff seeks summary judgment and contends that injunctive and monetary relief are warranted. Doc. 130. Defendants largely do not contest liability and concede some form of injunctive relief is appropriate. But Defendants challenge the scope of injunctive relief and seek summary judgment in their favor on the unavailability of monetary relief. Doc. 127. The Court finds that Defendants are liable, that Defendants owe $14,182.95 in monetary damages, and that a modified and narrowed injunction will issue.[2]

---

[1]   The relevant provisions of the FTC Act are Sections 5(a) (15 U.S.C. § 45(a)); 13(b) (15 U.S.C. § 53(b)); and 19 (15 U.S.C. § 57b(b)). Also at issue is a provision of an FTC Rule, the "R-value Rule," which is 16 C.F.R. § 460.22.

[2]   Defendants request oral argument on page 129 of their 130-page response to Plaintiff's summary judgment motion. This approach is certainly <u>not</u> the best way to catch the Court's attention and gain the opportunity to expand on an already-profuse written record. Regardless, the Court finds that the issues can be more efficiently and effectively

I.      **BACKGROUND**[3]

A.      **Defendants' Products and Marketing**

Pritchett developed the first formulation of Super Therm® around 1990. Defendants describe Super Therm® as "a water-borne combination of high-performance aliphatic acrylics, urethanes, and resin additives which produces a tough, yet flexible coating film" and note it "contains 4 unique ceramics to block heat gain into the surface upon which the coating film is applied." Doc. 90-2 at 1. SPI has at times described Super Therm® as a "white paint" that is "thicker and heav[ier] than traditional white paint because of the resin system and ceramics." Doc. 132-28 at 57. But Defendants distinguish Super Therm® from white paint in its energy-saving performance.

Defendants describe Sunshield as "a water-borne combination of [a] high-performance duo of elastomeric acrylics and resin additives, which produces a tough, yet flexible coating film" and "combines four different ceramics that provide both heat reflectivity and heat-blocking properties." *Id.* at 86. A technical data sheet included with product shipments lists Sunshield's first typical use as: "a one-coat roofing insulation system on exteriors to block the migration of Solar Heat gain." *Id.* Defendants herald Sunshield as a "[c]ost-efficient alternative with similar performance characteristics to Super Therm." Doc. 132-26 at 52.

SPI often told customers that Sunshield is primarily for home/residential projects and that Super Therm® "is primarily designed for use in industrial and harsh environments where maximum

---

resolved based on the briefing, which the Court closely reviewed, and that oral argument at this time is neither helpful nor necessary. Defendants' request for oral argument is denied.

[3]   The Court considers the following uncontroverted facts for purposes of summary judgment. This recitation of facts is a significantly pared-down version of the uncontroverted facts propounded by the parties (494 facts relating to Plaintiff's motion alone). The Court reviewed all the proposed facts and the responses and considered them in forming its understanding of the case. But for clarity and readership, the Court does not recount all of them here. To the extent facts are not specifically identified here, the Court assures the parties it has used the uncontroverted facts to resolve these motions.

performance and durability are critical."[4] *See, e.g.*, Doc. 141-22 at 2, 4, 7, 9, 12, and 15. A distributor distinguished Sunshield as a "residential (do it yourself) version of [SPI's] Super Therm (industrial version)." Doc. 132-28 at 90. But if customers asked about a coating for an unclear purpose, SPI offered to sell them either Super Therm® or Sunshield. And there are many instances where advertising materials showed Super Therm® applied to homes or where Super Therm® was used on residences instead of (or in addition to) commercial and industrial properties.

Defendants maintain authority to control marketing of Super Therm® and Sunshield, including through SPI's distributors. Distributors sign agreements that require them to adhere to SPI's policies, programs, instructions, and directions. SPI markets Super Therm® in about 40 countries through its network of distributors. SPI makes more than 90% of its sales of Super Therm® and Sunshield through its authorized distributors.

**B.    Defendants' False, Misleading, and Unsubstantiated Claims**

Plaintiff alleges that Defendants repeatedly misrepresented to distributors and customers the characteristics and efficacy of the Super Therm® and Sunshield products to increase demand and make sales. Some of these misrepresentations were simply inaccurate or false. Others may contain truth but were presented in a misleading or incomplete way (i.e., without qualification). Others may or may not be true, but Defendants lacked substantiation to prove their accuracy. All three types of misinformation are actionable under the FTC Act.

---

[4]    The Court often describes the actions of Defendants, customers, and distributors in the past tense. Defendants continue to sell Super Therm® and Sunshield, so many of these actions and descriptions are ongoing; the Court describes them in the past tense (sometimes with a date, sometimes not) when the record indicates an event or words that were used in materials or on a specific occasion. The Court clarifies if activity is ongoing when it matters for purposes of the relief requested in this case.

Plaintiff challenges two categories of Defendants' marketing claims for these products: (1): the products' energy savings claims, and (2) the products' "R-value"[5] or R-value equivalent claims before and after May 13, 2020.

### 1. Energy Savings Claims

One repeated error Defendants made over the years is to claim energy savings without qualification. For example, a Super Therm® brochure that Defendants used from 2015 to 2021 claimed without qualification that use of Super Therm® "combat[s] high energy costs," results in energy "savings," and brings about "cost-saving" and "long-term energy efficiencies." Doc. 90-5 at 2-5. The brochure then lists various uses without qualification or discussion. *See, e.g.*, *id.* at 4.



Another example for Super Therm® is that Defendants included technical data sheets with Super Therm® purchases from 2015 to October 2019 representing that Super Therm® "resists 95%

---

5   An "R-value" is a number quantifying a material's ability to resist heat flow. *See* 16 C.F.R. § 460.5. The larger the number, the more a product resists heat flow.

of Solar heat blocking Visual Light, Ultra Violet (UV) and Infrared (IR)." Doc. 90-2. And NEOTech, one of SPI's distributors, claimed that "Super Therm® Insulation Coating blocks 95% of heat." Doc. 132-28 at 329.

An example of the energy saving claims for Sunshield is Sunshield's webpage on the homedepot.com website, which claimed as recently as March 2022 that Sunshield has "4 unique ceramic materials that are designed to block and prevent 95% of solar heat from ever loading" and "[s]hatters high air conditioning/cooling cost when applied to all roofs and exterior walls." Doc. 132-26 at 32 ¶ 119.

### 2.   R-Value Claims before May 13, 2020

The actual R-value of Super Therm® when applied at 10 mils thick is approximately R-0.020.[6] The actual R-value of Sunshield at the same thickness is approximately R-0.016. But Defendants' marketing claims were different.

SPI gave marketing materials to distributors for years showing that Super Therm® had an R-value equivalent to R-19. Pritchett told SPI employees from the early 2000's through December 2017 to market Super Therm® as proven in laboratory tests to have an unqualified equivalent R-19 R-value. Defendants consistently gave distributors technical data sheets for Super Therm® since 2004 and every year from 2011 to 2019 that claimed that independent testing shows Super Therm® has an unqualified equivalent R-19 R-value. But SPI also claims it began removing references to R-values in marketing materials around 2011. And around 2011 (or 2010) it talked with several United States distributors about "not using the concepts of R-19, R-value, and R-value equivalency to promote and market Super Therm®." Doc. 141-5 at 40:11-19.

---

[6]   Defendants recommend Super Therm® be applied at a thickness of "10 mils," which equates to 0.01 inches once dried.

SPI and its distributors also advertised on their websites that Sunshield has an R-17 equivalent rating in October 2016 and May 2019. And in 2019 two of Defendants' distributors advertised Sunshield as comparable to Super Therm® in terms of insulation effectiveness and R-rating.

### 3.    R-Value Claims after May 13, 2020

Defendants continued making several R-value claims about Super Therm® after May 13, 2020.[7] Those claims are summarized below.

- On multiple occasions between May 2020 and May 2021, Defendants responded to customer questions about R-value by stating that Super Therm® is an R-19 equivalent product.

- On September 14, 2020, SPI's employee Timothy Cappel sent a 2017 Super Therm® document to a potential customer and an SPI employee. The document stated Super Therm® had an R-18.85 equivalent. Cappel did qualify the information by clarifying that: "Energy saving benefits from the use of Super Therm® will vary depending upon a variety of operational and environmental factors." Doc. 132-28 at 308. He further advised that "[t]herefore, the best strategy is to discuss the significant reduction in heat load from solar radiation produced by the use of Super Therm®." *Id.*

- Continuing through at least October 2020, Defendants circulated a document created in May 2013 (and revised thereafter) that purports to provide scientific and mathematical support for Defendants' R-18.85 equivalent claim. The document went to SPI employees, distributors, and Super Therm® customers and potential customers.

- SPI continued making R-19 equivalent claims for Super Therm® through at least May 2021 "because some of [SPI's] distributors wanted to have this . . . always they want this comparison with standard insulation." Doc. 132-17 at 137:1-138:6. SPI admitted in May 2021 it never told its employees to stop using Super Therm® R-19 equivalency claims. SPI believed "we had testing, we had letters, and we had equivalency." Doc. 132-14 at 224:5-22.

- In 2020, Pritchett commissioned a 3.5-minute Super Therm® promotional video that included a 2-second clip claiming that Super Therm® performs "as effectively as fiberglass with a R-19 rating as shown by the Hot Box Test." Doc. 132-26 at 14-15 ¶¶ 56, 57. Plaintiff captured the video on June 8, 2021.

---

[7]    This date is significant to monetary damages because it is the effective date of 16 C.F.R. § 466.22, the FTC Rule Plaintiff alleges Defendants violated by making false R-value claims that were not properly supported by approved testing.

- Plaintiff made several "website captures" after May 13, 2020, about Super Therm® being an R-19 equivalent, but many were on the websites of distributors with whom Defendants had previously terminated the distributor relationship.

- SPI did not bar all distributors from claiming Super Therm® is an R-19 equivalent before May 2021.

## C.     Defendants' Culpability

Defendants concede they made many claims that were false, unqualified, or unsubstantiated. They attempt to justify the claims by citing tests they commissioned or performed, letters of validation they possessed, and their lack of control over former distributors. Plaintiff regards these arguments as an attempt to raise a "good faith reliance" defense, which is not a valid defense to liability under the FTC Act. Doc. 144 at 26 n.42 (citing *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005); *FTC v. Affiliate Strategies*, 2010 WL 11407103, at *10 (D. Kan. 2010)). But these facts also seem relevant to the scope of an injunction. This is the purpose for which the Court has considered these facts.

### 1.     Defendants' Knowledge of Falsity

There were many red flags before Plaintiff contacted Defendants in April 2019. These red flags arguably alerted or should have alerted Defendants that their R-value claims were untrue. These red flags are summarized here. But mixed in with the red flags are resources and apparent validations from outside entities (largely from VTEC Laboratories Inc.) that seem, somewhat inexplicably, to have given Defendants a foundation for believing they had a valid R-19 claim. It is murky, but it seems possible that Defendants' R-value debacle stems from one inadequate but well-meaning test in 1994. Regardless, the record shows that Defendants continued promoting an R-19 R-value (or equivalent) after they should have stopped.

- <u>1994:</u> Pritchett conducted an experiment that is referred to as the "Pritchett Light Box Demo." In this experiment, he compared Super Therm® and fiberglass insulation using three 16-inch boxes. He painted Box 1 inside with Super Therm®. He wrapped Box 2 in R-19 fiberglass batt insulation. He left Box 3 as a control box. Pritchett turned on a light bulb in each box and noted the temperature for 5 minutes. Pritchett testified that "some engineers" wanted the test done, so he "followed their instructions." Doc. 141-12 at 142:7-12. Plaintiff's expert Dr. David Yarbrough opined the test does not provide meaningful data. It is not the type of standardized testing experts would use to evaluate thermal properties. But Dr. Yarbrough did agree that a similar test could indicate whether a product has an energy-saving component.

- <u>January 1997:</u> Thermophysical Properties Research Laboratory Inc. ("TPRL") tested Super Therm® and gave Defendants a report without an R-value. But the report included data from which one can calculate the R-value at 10 mils thickness to be approximately R-0.0023.

- <u>March 1997:</u> Defendants possessed a letter purportedly from David L. Taylor, a researcher with TPRL, that indicated that he had reviewed the information provided by SPI and found Super Therm® resisted heat "as effectively as fiberglass with a R 19 rating as shown by the Hot Box Test." Doc. 132-29 at 111. The "Hot Box Test" was the 1994 Pritchett Light Box Demo.

- <u>January 1, 1998:</u> VTEC wrote a letter at Defendants' request. The letter (inaccurately) stated in part: "As stated in the [January 1997] testing report performed at [TPRL] the calculated R-value is to be RE-19." *Id.* at 113. The January 1997 TPRL report did not make this statement.

- <u>April 1998:</u> VTEC tested Super Therm® and found the combined R-value of the coating on a one-half-inch thick gypsum wallboard to be R-0.48 if the combination were expanded to be one-inch thick.

- <u>Early 2000's:</u> Pritchett promised TPRL that "the [1997 David L. Taylor] letter is gone" and that "I will not use it" to market Super Therm® after having a "major disagreement" with TPRL over the matter. *Id.* at 112.

- <u>2002:</u> Defendants knew from TPRL's statements that the R-value of Super Therm® at 10 mils is approximately R-0.002.

- <u>May 5, 2004:</u> VTEC wrote a letter at Defendants' request stating that Super Therm® "has performed as an insulation when applied to exterior/interior building materials" and that "[Super Therm®] can perform as an equivalent R 19 based upon the application and test method." Doc. 132-30 at 7.

- <u>2005:</u> VTEC sent Defendants results of seven tests on Super Therm® by NETZSCH Instruments Inc. The tests showed the mean thermal conductivity to be 0.559 w/(mK), which is an R-value of approximately R-0.0026 at the thickness of approximately 10 mils.

- <u>2011:</u> The Oak Ridge National Laboratory Building Envelopes Research Team tested Super Therm®. Defendants received the testing results on June 20, 2011. The results showed the R-value of the coating to be R-0.0030 if applied 20 mils thick. The team also stated that considering "the cooling benefits of the high solar reflectivity during hot, sunny months and heating penalty during cold months by estimating energy costs to heat and cool the building, the energy use costs per roof area for the Super Therm roof were slightly less than the reference white roof system" (which was coated in non-ceramic white paint). Doc. 132-28 at 83.

- <u>November 29, 2012:</u> VTEC sent a letter to SPI purporting to summarize the results of six tests of Super Therm®. VTEC stated the combined R-value of Super Therm® on a 1/16-inch stainless steel plate, along with 50 mils of another coating, is R-0.06.

- <u>May 2, 2013:</u> VTEC wrote a letter to Defendants stating that Super Therm® "has performed as an insulation when applied to exterior/interior building materials" and that "[Super Therm®] can perform as an equivalent R 19 based upon the application and test method." Doc. 132.29 at 165. It is unclear to the Court why (particularly after VTEC sent Defendants results inconsistent with this R-value in both 2005 and 2012) VTEC would continue to write R-19 letters for Defendants. Defendants represented to VTEC that Super Therm® only had minor changes in formula (improvements) since the time VTEC wrote its previous letters, so perhaps this was all VTEC needed.

- <u>November 9, 2017:</u> SPI's employee Cappel told Pritchett, five SPI employees, and a distributor: "We cannot represent in general that Super Therm has an R value equivalency of R-19; it does not, and we open ourselves up to serious criticism by making such a false statement." Doc. 132-29 at 69.

- <u>January/February 2019:</u> VTEC sent Defendants a letter stating, "VTEC Laboratories, Inc. has reviewed the ASTM C 1363 test data referenced as qualifying test methods for determining thermal properties in ASHRAE 90.1: 2016 and have found the [Super Therm®] material can perform as equivalent to R-19 insulation based upon application." *Id.* at 175.

- <u>May 3, 2019:</u> SPI wrote to Plaintiff that Super Therm® "cannot have a R-value or a R-value equivalency based upon established criteria" and that Super Therm® "does not have a R-value or a R-value equivalency." *Id.* at 76.

- <u>September 8, 2021:</u> SPI sent a memo to all distributors stating: "We have disputed and challenged each of the claims made by [Plaintiff]" in this lawsuit. SPI told distributors not to claim Super Therm® or Sunshield (1) "has an R-value or RE-Value"; (2) "is an insulation or an insulation coating"; (3) "is intended for use on interior surfaces to block

heat transfer"; or (4) that their "performance compares favorably to any other type of insulating material." SPI required distributors to "have a reasonable basis" for energy savings claims. Doc. 132-26 at 265.

### 2.    Other Coatings

Plaintiff is concerned that Defendants will simply market their products under different names and falsely represent the characteristics of the products if the Court enjoins Defendants from making deceptive claims only about Super Therm® and Sunshield. Plaintiff supports this concern by identifying several products Defendants have produced and marketed over the years wherein they represent R-values of over 11. The Court does not recount all these products here, as Defendants have attached evidence showing the products are no longer produced (or never were). Suffice it to say that after reviewing the list of products and the circumstances under which they were produced and marketed, the Court finds no inference of a pattern of "bait-switching," such as to cause the Court concern that Defendants would try to circumvent the Court's order by renaming and repackaging Super Therm® and Sunshield.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

### III.      ANALYSIS

There are several statutes and regulations at play in this case. The Court briefly highlights the differences here for ease of reference:

- Sections 5(a) and 13(b) of the FTC Act grant Plaintiff the authority to obtain injunctive relief for "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. §§ 45(a) and 53(b).[8]

- Section 19 of the FTC Act gives the FTC rule-enforcement authority by allowing the FTC to obtain monetary relief for rule violations. *Id*. § 57b(b).[9]

- 16 C.F.R. § 460.22 is part of the "R-value Rule" and is aimed at non-insulation products.

First, the Court addresses liability and then relief for Plaintiff's three claims for which it seeks injunctive relief under Section 5(a). Second, the Court addresses Plaintiff's claim that it is entitled to monetary damages under Section 19 for violation of 16 C.F.R. § 460.22, which is a section of the R-value Rule.

### A.       Injunctive Relief for False Claims in Violation of Section 5(a)

Plaintiff claims it is entitled to injunctive relief under Section 5(a) of the FTC Act, which corresponds to 15 U.S.C. § 45(a), because Defendants: (1) made false energy savings claims, (2) made false R-value claims before May 13, 2020, and (3) furnished distributors with the means and instrumentalities to make false claims. Plaintiff contends Defendants made these false claims while advertising and promoting Super Therm® and Sunshield. And Plaintiff seeks injunctive relief as a

---

[8]  Plaintiff originally sought monetary damages under this provision, but the Supreme Court foreclosed this attempt in *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021). Plaintiff then amended its complaint to add a count under Section 19 of the FTC Act. Doc. 90.

[9]  Plaintiff may also seek damages for any unfair or deceptive acts for which it "has issued a final cease and desist order." § 57b(a)(2). Because Plaintiff did not go through an administrative process and issue a cease-and-desist order to Defendants, it is limited to seeking redress for rule violations only. *See* § 57b(b).

result. The Court starts by analyzing liability for these claims and then turns to the scope of injunctive relief.

### 1.        Liability under Section 5(a)

Plaintiff establishes liability for these claims by showing that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021) (citation omitted). Defendants do not dispute liability on these claims.[10] Neither do they dispute that Pritchett is liable individually for the actions of his company.[11] The Court nevertheless briefly discusses the elements of these Section 5(a) claims to establish the foundation for the scope of the injunction.

### a.        False Energy Savings Claims

The Court analyzes the three elements. First, the unconverted facts establish that Defendants made many representations about the characteristics and benefits of Super Therm® and Sunshield. These statements, or "claims," may be sorted into two categories: efficacy claims and establishment claims. Efficacy claims represent that a product performs as advertised. *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015). Efficacy claims do not suggest a backing of scientific proof. *Id.* Establishment claims, on the other hand, suggest the product is scientifically proven effective. *Id.* Establishment claims may be "specific" or "non-specific." *Id.* at 491.

---

[10]  Defendants do dispute the R-value Rule claims, which are discussed below.

[11]  Individuals may be enjoined for the actions of a corporation under the FTC Act if they (1) directly participated in the challenged actions or (2) had authority to control the actions. *Freecom Commc'ns, Inc.*, 401 F.3d at 1202-03. They may be responsible for restitution resulting from corporate misconduct if they "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014) (citation omitted). The undisputed evidence (including a stipulation in the Pretrial Order) shows Defendant Pritchett is liable for the actions of Defendant SPI.

Plaintiff alleges Defendants made many misleading or unsubstantiated claims over the past two decades. Defendants admit they made such claims (but disagree some of them were misleading or unsubstantiated). The following is a small sampling of the statements that are indisputably untrue, misleading, or unsubstantiated: (1) Super Therm® blocks interior heat; (2) Super Therm® blocks heat, 95% of solar heat, and 99% of BTU heat; (3) Defendants' products offer savings on utilities and energy, up to 90% savings with Super Therm®; and (4) the United States Department of Energy found certain energy savings amounts ranging from 26-52%.

Second, these representations are likely to mislead. A claim is likely to mislead consumers when it is false or lacks substantiation. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). Actual deception is unnecessary, and Plaintiff need only show the likelihood that a reasonable consumer would be deceived. *FTC v. LoanPointe, LLC*, 525 F. App'x 696, 701 (10th Cir. 2013).

The standard for "substantiation" depends on the type of claim. For an efficacy claim, an advertiser must possess a "reasonable basis" for the claim. *POM Wonderful, LLC*, 777 F.3d at 490. For an establishment claim, the amount of substantiation is different based on whether the claim is specific or non-specific. *Id.* at 491. If specific, the advertiser must possess the specific substantiation claimed. *Id.* If non-specific, the advertiser "must possess evidence sufficient to satisfy the relevant scientific community of the claim's truth." *Id.* Defendants bear the burden to show the basis for their advertisements, and they must possess the substantiation before making the claim(s). *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 298 (D. Mass. 2008) (citing *FTC v. QT Inc.*, 448 F. Supp. 2d 908, 959 (N.D. Ill. 2006)).

The sampling of statements identified above are either misleading or lack proper substantiation. Defendants argue that many of their claims are accurate under certain conditions, for certain time periods, in particular locations, and on specific structures. This may be true. But

the fact remains that Defendants <u>didn't</u> qualify their statements with the details behind the claims. There may be accurate and non-deceptive claims that <u>could</u> be made of energy savings, but those claims are not the ones the Court is evaluating.

<u>Third</u>, the misleading energy-savings representations were material. Liability is only warranted "if the omitted information would be a material factor in the consumer's decision to purchase the product." *In re Am. Home Prods. Corp.*, 98 F.T.C. 136, 368 (1981), *enforced as modified*, 695 F.2d 681 (3d Cir. 1982); *see also FTC v. Colgate-Palmolive Co.*, 380 U.S. 347, 386-89 (1965).

Defendants do not seriously dispute that the misleading and unsubstantiated claims identified above are material to the product-purchase decision. There would be no reason to purchase Defendants' products over a can of white paint if Defendants' claims were not material. Plaintiff has met its burden as to all three elements of its first Section 5(a) deception claim and is entitled to some injunctive relief.

### b.        R-Value Claims before May 13, 2020

Plaintiff's next type of Section 5(a) claim principally relates to Defendants' R-value claims before May 13, 2020.[12] Specifically, Plaintiff alleges Defendants (1) made false R-value claims and (2) "represented that testing establishes an R-value or R-value equivalent of R-19 for Super Therm®, but testing does not do that." Doc. 122-1 at 9.

Defendants' representations about the R-value of their products ultimately require two separate analyses. One is relatively simple, and the other is not. The first is addressed in this

---

[12]   Claims after May 2020 are also relevant to these causes of action, but the Court only addresses earlier claims here for simplification. They are sufficient to establish liability without discussing more recent R-value claims.

paragraph and primarily relates to representations made before May 13, 2020.[13] Defendants acknowledge that they inaccurately portrayed the R-value of Super Therm® before this date. They also made at least two inaccurate representations about the R-value of Sunshield. And they represented that testing established those R-values, but this was also false. These representations were likely to mislead and were material, so Plaintiff has shown all three elements and is entitled to some injunctive relief on this claim.

### c.      Means and Instrumentalities

Plaintiff's third cause of action is for furnishing distributors with promotional materials that make false, misleading, or unsubstantiated representations. Defendants are not only responsible for their own advertising representations, but they are also responsible for the representations of their distributors. *See Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963 ("Those who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation of Section 5 of the Federal Trade Commission Act."). Defendants do not dispute that they furnished distributors with promotional materials that made false, misleading, and unsubstantiated representations. These representations are likely to mislead and are material for largely the same reasons previously discussed. Again, Plaintiff has established this claim and has shown entitlement to some level of injunctive relief for it.

### 2.      Injunctive Relief under Section 5(a)

The Court has determined that Plaintiff is entitled to some measure of injunctive relief for Defendants' Section 5(a) violations. And the Court has authority under the FTC Act to issue a permanent injunction when the facts demonstrate that there is "some cognizable danger of

---

[13]   The second, about representations made after May 13, 2020, is addressed in more detail in the discussion about Defendants' violation of the R-value Rule.

recurrent violation." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also* 15 U.S.C. § 53(b). The Court considers (1) the "bona fides of the expressed intent to comply," (2) "the effectiveness of the discontinuance," and (3) "in some cases, the character of the past violations." *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (quoting *W.T. Grant Co.*, 345 U.S. at 633). Because Defendants concede some injunctive relief is appropriate, the Court uses these factors to craft the scope of the injunction instead of to decide whether any relief is appropriate at all.

The principal disputes are the breadth of relief with respect to product scope and length of compliance period. The Court analyzes these issues but also makes other changes to the proposed injunctive relief in an exercise of its discretion based on the facts of this case. Injunctive relief is "not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952). The remedy must, however, retain a reasonable relation to the unlawful practices. *Id.* Violators must expect some level of "fencing in." *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 431 (1957). Stated differently, the Court may extend prohibitions to "similar practices with respect to 'any product' Defendants advertise." *Colgate-Palmolive, Co.*, 380 U.S. at 384.

### a.      Product Scope

Plaintiff wants the injunction to cover any "Architectural Coatings Product." Plaintiff defines these products as "any coating marketed for application on buildings, including paint, paint with additives (such as ceramic spheres), varnishes, and lacquers, and products that incorporate such coatings." 2022-03-14 Proposed Final Order. Plaintiff argues this broad application is critical because "[o]therwise, Defendants could simply tweak formulae or rename the products to sidestep this provision—and the uncontested evidence shows they do just that." Doc. 132 at 124.

Plaintiff's fears do not justify a broader product scope. It appears Defendants have marketed and, in some instances, produced other products with claimed energy savings and R-values. But the other products were not created or marketed to avoid the consequences of a court ruling. The Court is not convinced Defendants will now try to circumvent an injunction by making false or unsubstantiated claims with other existing or new products. Plaintiff simply assumes too much. The Court has authority to issue the broad ban Plaintiff wants but exercises its discretion to more narrowly tailor relief to the violations found in this case.[14] The Court makes the injunction applicable to "non-insulation products," which are products Defendants create "that are not insulation but marketed, in whole or in part, to reduce energy use."[15] *Cf.* 16 C.F.R. § 460.22. This is the definition Defendants suggest, and the Court finds it appropriate here.

### b. Length of Compliance Period

Plaintiff also asks the Court to impose a 10-year compliance-reporting period and an indefinite compliance-monitoring period. But this request is disproportionate to the harm suffered and level of culpability. Most of Defendants' customers are commercial and industrial clients. These purchasers have often independently studied Super Therm® before purchasing. And residential customers, by and large, appear satisfied with their purchases.[16] Plaintiff has not shown that Defendants' deception was as rampant, intentional, or damaging as would justify burdensome long-term compliance reporting and monitoring.

---

[14] Specifically, the Court recognizes that other orders have contained similarly broad injunctions. *See, e.g.*, *FTC v. SuperTherm, Inc.*, Doc. 132-30 at 20; *In re Kryton Coatings Int'l, Inc.*, 2002 WL 34463119 (F.T.C. 2002). But *FTC v. SuperTherm* was decided on default judgment. 2021 WL 3419035 (D. Ariz. 2021). And *In re Kryton* was an administrative proceeding consent order. Thus, neither case convinces the Court to issue a broader injunction.

[15] The Court acknowledges that this definition relates to R-values and Plaintiff's claims are broader than just R-values. But Plaintiff's definition is too broad and the definition for non-insulation products in the R-value Rule is a reasonable, more targeted, substitute.

[16] The Court does not find Defendants' evidence of homedepot.com reviews sufficient to establish a pattern of "happy customers," but likewise Plaintiff has not uncovered evidence of a significant number of customer complaints.

The Court determines that 5 years of compliance reporting and 5 years of compliance monitoring is sufficient to adequately address the level of deception presented in this case. *See SuperTherm, Inc.*, 2021 WL 3419035, at *9 (imposing 5-year compliance-reporting period); *Affiliate Strategies, Inc.*, 2011 WL 3300097, at *8-10 (ordering 11-year recordkeeping and 8-year compliance reporting and distribution of order to agents). *But see FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257 (S.D. Fla. 2019) (Doc. 266 in Case No. 18-61017: imposing 20-year recordkeeping and compliance reporting). This 5-year period will serve to support the purpose of the FTC Act while avoiding lengthy and burdensome reporting and monitoring responsibilities that are disproportionate to this case.

### B.    Monetary Relief under Section 19(b) for Violation of the R-Value Rule

Plaintiff also seeks monetary relief for violations of the R-value Rule. This claim is discussed separately because the liability arguments are nuanced and the requested relief is monetary. Indeed, it is Plaintiff's claim for damages based on Defendants' R-value claims (specifically the R-value claims made after May 13, 2022) that forms the central dispute in this case. On May 13, 2020, the R-value Rule (16 C.F.R. part 460) was modified to apply to non-insulation products like Super Therm® and Sunshield. The revision is in 16 C.F.R. § 460.22, which states:

> If you make an R-value claim for a product . . . that is not home insulation and is marketed in whole or in part to reduce residential energy use by slowing heat flow, you must test the product pursuant to § 460.5 using a test or tests in that section appropriate to the product. Any advertised R-value claims must fairly reflect the results of those tests.

This revision prompts two main issues that require resolution in this case: (1) the meaning of "R-value claim" and (2) how that meaning applies to Defendants' products.

### 1.    Meaning of "R-value Claim"

The parties dispute the meaning of an "R-value claim." Defendants argue that it means a claim that a product has a specific, numeric R-value. Plaintiff argues that the term is much broader and covers express, implied, and comparative claims. The R-value Rule does not define the term. *See generally* 16 C.F.R. part 460.

Plaintiff repeatedly argues that the Court must defer to its interpretation of its own regulation. Courts refer "to that doctrine as *Auer* deference." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411 (2019) (plurality opinion). But "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* at 2415 (majority opinion). "And before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Id.* (citation omitted). Thus, resolving this dispute initially involves deciding whether the term "R-value claim" is ambiguous.

A regulation is "ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways." *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1226 (10th Cir. 2014) (quotations and citations omitted). To determine ambiguity, courts "reference . . . the language itself, the specific context in which that language is used, and the broader context of the [regulation] as a whole." *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Courts begin by "examining the plain language of the text, giving each word its ordinary and customary meaning." *Mitchell v. Comm'r*, 775 F.3d 1243, 1249 (10th Cir. 2015). "If, after engaging in this textual analysis, the meaning of the regulations is clear, our analysis is at an end, and we must enforce the regulations in accordance with their plain meaning." *Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1261 (10th Cir. 2018) (quoting *Mitchell*, 775 F.3d at 1249). But again, before declaring a regulation

ambiguous, a court must use all its "tools," including not only the text but also the structure, history, and purpose. *Kisor*, 139 S. Ct. at 2423-24.

As noted above, an R-value is a number quantifying a material's ability to resist heat flow. *See* 16 C.F.R. § 460.5. The size of the number indicates a product's ability to resist heat flow. The larger the number, the more the resistance. *E.g.*, Labeling & Advertising of Home Insulation: Trade Regulation Rule, 70 Fed. Reg. 31258-01, at 31258 (May 31, 2005) ("R-value is the numerical measure of the ability of an insulation product to restrict the flow of heat . . . the higher the R-value, the better the product's insulating ability."). The plain language therefore indicates that an R-value <u>claim</u> is a <u>claim</u> that a product has a particular numerical R-value.

The R-value Rule's scheme and structure also support this definition. The rule "requires covered entities to disclose R-value and related information." Labeling & Advertising of Home Insulation: Trade Regulation Rule, 84 Fed. Reg. 20777-01, 20777 (May 13, 2019). Multiple sections of the rule discuss R-values. Section 460.5 requires advertisers to base "R-values given" in marketing on a prescribed test. Section 460.8 specifies that marketing materials for insulation specimen must not "have an R-value more than 10% below the R-value shown." Section 460.11 governs when R-values "shown" in promotional materials may be rounded off. To calculate a percentage of or "round off" an R-value requires that the R-value must be a number.

Other portions of the R-value Rule further support the conclusion that the R-value claim must be a number. Section 460.12 requires that most insulation labels contain the R-value and the statement: "R means resistance to heat flow. The higher the R-value, the greater the insulating power." 16 C.F.R. § 460.12(c). The same section discusses required disclosures about how insulation must be installed properly to attain the "marked R-value." *Id.* § 460(d), (e). Similarly, § 460.13(c) requires disclosures of numeric R-values on insulation fact sheets. Sections 460.18

and 460.20 discuss additional requirements for R-value disclosures that involve providing an R-value for a specific thickness of insulation and limitations on R-value per inch calculations. Again, each of these sections refers to the R-value as a number.

One last contextual clue supports Defendants' definition of R-value claim: the use of implied claims elsewhere in the R-value Rule but not in § 460.22. Section 460.19 specifically prohibits insulation marketers from "say[ing] or imply[ing]" that their products "can cut fuel bills" without a "reasonable basis for the claim." Section 460.21 prohibits marketers from "say[ing] or imply[ing]" that a government agency uses a product "unless it is true." Likewise, under § 460.23, a marketer may not "say or imply" that a product qualifies for a tax benefit unless that claim is true.

Despite Plaintiff's decision to address implied claims in other sections of the R-Value Rule, § 460.22 makes no mention of implied R-value claims. This omission is telling. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). It indicates to the Court that Plaintiff is incorrect that an R-value claim also includes implied claims.

Contrary to Plaintiff's assertion, the presence of the word "any" in § 460.22 does not alter the Court's analysis. Plaintiff argues that § 460.22's reference to "any advertised R-value claims" covers "claims of 'whatever kind'—e.g., express, implied, and comparative." Doc. 143 at 43. And Plaintiff maintains that Defendants' proposed narrow definition of R-value claim violates the principle that the FTC Act should be interpreted broadly and advertisements construed against the advertiser. *Id.* at 44-45 (citing *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854 (9th Cir. 2018); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1045-46 (C.D. Cal. 1999)). The Court disagrees. Based on the

plain language of § 460.22, its context, and the scheme of the R-value Rule, the Court finds § 460.22 unambiguous. An "R-value claim" is a claim that a product's R-value is a particular number. It is no more and no less. If an advertised claim lacks an explicit R-value number, it does not fall under § 460.22's umbrella.[17]

### 2. Application to Defendants' Products

The next issue is whether Defendants made any R-value claims about the products after May 13, 2020, based on this definition.

#### a. Sunshield

The Court starts with Sunshield. The answer is no. Plaintiff identifies the following statements Defendants made about Sunshield after May 13, 2020:

- a "[c]ost-efficient alternative with similar performance characteristics to Super Therm," while claiming Super Therm® "[r]eplaces 6-8 in. of traditional insulation" and is "[Defendants'] best-selling insulation coating."

- "similar to Super Therm in solar heat blocking performance" and "will perform 85% as well as Super Therm" using "4 similar unique ceramic compounds as used in Super Therm."

- having "a similar ceramic package as our best-selling Super Therm" to "[r]educe energy costs for less."

- in general having the same or similar components and suggested uses as Super Therm.

- just "[n]ot as long lasting as Super Therm."

- a "do it yourself" "version of Super Therm" or "a little brother to Super Therm."

---

[17] Even if the regulation were genuinely ambiguous, deference to the agency's interpretation would still be inappropriate. To trigger *Auer* deference, the agency interpretation must also (among other things) "be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." *Kisor*, 139 S. Ct. at 2416 (citation omitted). Plaintiff fails to show that its interpretation emanates from authoritative actors using those vehicles that "are understood to make authoritative policy in the relevant context." *Id.* And the Court is also concerned that Plaintiff's interpretation would create "unfair surprise to regulated parties" *Id.* at 2417.

- able to "[s]hatter[] high air conditioning / cooling cost[s]" for residential users.

Doc. 143 at 41 (citations omitted).

None of these statements or Sunshield's marketing materials include a numeric R-value. Plaintiff argues this omission is immaterial because of the repeated comparisons and references to Super Therm®, which Defendants claimed has an R-19 R-value. This is an impermissible stretch based on the Court's analysis. Plaintiff is attempting to impute claims about Super Therm® to Sunshield without citing authority for doing so. Defendants have not made an R-value claim with respect to Sunshield since May 13, 2020.

### b.     Super Therm®

The Court now turns to Super Therm®. This is a different story. Defendants have made specific numeric R-value claims for Super Therm® since that date (without properly supporting them with testing). Super Therm® is primarily targeted at commercial and industrial customers, but the record shows that it is also "marketed . . . in part to reduce residential energy use by slowing heat flow." The question then becomes whether there is monetary relief for those violations. Plaintiff added a cause of action for the R-value Rule violation after the Supreme Court decided Plaintiff's original avenue for seeking monetary relief (Section 13(b) of the FTC Act) was invalid. *AMG Capital Mgm't*, 141 S. Ct. 1341; *see also* Doc. 90. Plaintiff seeks nearly $1.5 million in redress, most of which consists of sales of Super Therm® through distributors to commercial and industrial end users. Defendants have sold only about $15,000 of Super Therm® to individuals (presumably residential end-users) since May 13, 2020.

Section 19(b) of the FTC Act permits Plaintiff to seek monetary relief "necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from [a] rule

violation." 15 U.S.C. § 57b(b).[18] This authority is limited. *See, e.g.*, *FTC v. Noland*, 2021 WL 5493443, at *6 (D. Ariz. 2021) (highlighting Section 19(b)'s "narrow focus on providing damage awards 'necessary to redress injury'"); *FTC v. Zurixx, LLC*, 2021 WL 5179139, at *7 (D. Utah 2021) ("The change . . . from the previous gross revenue damages under Section 13(b) to the individualized consumer redress damages under Section 19 is a significant change in not only the amount of damages but the type of evidence needed to demonstrate those damages."). Relief may come in the form of "rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification." 15 U.S.C. § 57b(b).

The parties dispute whether commercial and industrial end users are "consumers" under 16 C.F.R. § 460.22. Plaintiff argues the answer is simple: Section 19(b) specifically provides that corporations may recover under the Act. And Plaintiff further argues that the R-value Rule is not limited by the type of user. Rather it applies based solely on how a product is marketed. If a business markets a product in any way to residential users, who then buys and uses the product is irrelevant. The answer is not so simple.

The right to recovery for corporations in the FTC Act does not answer the question of whether corporate end-users are covered by the R-value rule. The FTC Act does not define "consumer." *See generally* 15 U.S.C. § 44. Neither does the R-value Rule offer a definition. *See generally* 16 C.F.R. part 460. But the regulation is not ambiguous once the Court utilizes interpretive tools. *See Kisor*, 139 S. Ct. at 2415.

Plaintiff does not dispute that the R-value Rule only covered purchases by residential consumers before § 460.22's addition on May 13, 2020. *See* Doc. 143 at 35; Labeling and

---

[18]   As previously noted, Plaintiff is limited to seeking damages for rule violations because it did not go through an administrative process and issue Defendants a cease-and-desist order.

Advertising of Home Insulation: Trade Regulation Rule, 84 Fed. Reg. 20777, 20780 (May 13, 2019) ("[The R-value Rule] does not cover insulation sold for use in commercial (including industrial) buildings."); *see also, e.g.*, *Mono-Therm Indus., Inc. v. FTC*, 653 F.2d 1373, 1375 (10th Cir. 1981) ("The primary purpose of the [R-value] Rule . . . is to correct the failure of the home insulation marketplace to provide . . . essential pre-purchase information to the consumer (for home insulation products)."); *Nationwide Tarps, Inc. v. Midwest Canvas Corp.*, 228 F. Supp. 2d 202, 208 (N.D.N.Y. 2002) ("[T]he [R-value] Rule mandates standards in the home insulation market, but not in the commercial insulation market."). And, contrary to Plaintiff's current argument, there is no evidence that amending the R-value Rule to cover non-insulation products also broadened the R-value's scope to extend to purchases by commercial entities.

First, the text of § 460.22 regulates "R-value claims . . . marketed in whole or in part to reduce residential energy use by slowing heat flow." This language indicates the rule is designed to protect <u>residential</u> buyers from false or misleading R-value claims. These are the "consumers" who may be entitled to redress. And use of the term "[a]ny advertised R-value claims" in the second sentence of § 460.22 does not broaden the definition of consumer. The sentence specifies that any advertised R-value claims must "fairly reflect the results of [the] tests [identified in § 460.5]." The tests are for products that are "marketed in whole or in part to reduce residential energy use by slowing heat flow." Again, all indications are that the rule intends to protect residential end-users and not commercial and industrial customers.

The context and structure of the R-value Rule support the same restriction. The title of the R-value Rule is "Labeling and Advertising of Home Insulation."[19] 16 C.F.R. § 460. The R-value

---

[19]   The Court realizes the relevant products at issue are non-insulation products. This difference neither changes the analysis nor suggests that § 460.22 should be treated differently than the rest of the R-value Rule.

Rule itself contains multiple references to homes and residences. *See, e.g.*, 16 C.F.R. § 460.2 (specifying the rule applies to "insulation developed and marketed for commercial and industrial buildings that is also marketed for <u>and used</u> in residential buildings" (emphasis added)); *Id*. § 460.3 (stating the rule covers members of the "home insulation industry"); *Id*. § 460.4 (stating the rule applies "each time you . . . sell . . . home insulation," and that "[y]ou must follow the requirements in § 460.22 each time you make an R-value claim for non-insulation products marketed in whole or in part to reduce residential energy use").

Plaintiff essentially argues that all this no longer matters. Plaintiff now says (correctly) that Super Therm® was marketed in part to residential users. Thus, because § 460.22 focuses on marketing, Plaintiff reasons (incorrectly) that commercial users must also be protected under the rule. But a look at the regulatory history rejects this interpretation.

When Plaintiff proposed amendments to the R-value Rule in 2018, it proposed requiring "marketers to use the Rule's testing requirements to substantiate any R-value claims for non-insulation products." Labeling and Advertising of Home Insulation: Trade Regulation Rule, 83 Fed. Reg. 2934-01, 2935 (January 22, 2018). In doing so, Plaintiff was proposing an addition to the R-value Rule. When speaking of the application of the rule, however, Plaintiff described itself as "[c]larify[ing] that the Rule covers products marketed for residential applications, even if those products are originally developed for the commercial market." *Id.* Sweeping industrial users into the group of protected consumers is belied by Plaintiff's description of its actions as a <u>clarification</u>.

The Court's interpretation is further bolstered by Plaintiff's response to comments. One commenter "urged the [FTC] to clarify that 'if a product is <u>used</u> in residential insulation applications, there must be compliance with the Rule, even if the lion['s] share of the product's use is in the commercial and industrial market.'" *Id.* at 2937 (emphasis added). Plaintiff responded

that: "Such products <u>already fall</u> within the Rule's existing coverage of '<u>home insulation</u>.' However, the proposed amendments would <u>clarify</u> this fact to ensure that industry members understand their compliance obligations." *Id.* at 2938. (emphasis added). Plaintiff's <u>own description</u> therefore states that non-insulation products would become <u>just like</u> "home insulation." Plaintiff's argument before this Court that "the obligations of . . . insulation and non-insulation marketers . . . are vastly different under the Rule" and that "[a] non-insulation product marketed under § 460.22 is an exception" to the rule that industrial consumers are not protected is disingenuous under its own description.

In summary, there is nothing in the regulatory text or history to suggest that commercial users are now protected consumers under the R-value Rule. Plaintiff can now seek damages for industrial non-insulation products that are <u>sold</u> to residential consumers, but it has not enacted a sea change such that industrial end-users are protected consumers.[20]

This analysis leads to the following result: The monetary relief appropriate here is for residential buyers of Super Therm® since May 13, 2020.[21] It is not for all purchasers of Super Therm®. The amount of individual sales proceeds since May 13, 2020, of Super Therm® is $14,182.95. This will be the judgment. The Court will not reduce this amount based on the theoretical "happy consumers" or based on purchasers still receiving the value of white paint.[22] Defendants have not shown either reduction is appropriate for the purchasers in this case.[23]

---

[20] Like above, even if the regulation were genuinely ambiguous, deference to the agency's interpretation is not appropriate because the agency has not presented an authoritative or official position on this issue. *Kisor*, 139 S. Ct. at 2416. The agency's interpretation would also likely cause unfair surprise to regulated parties. *Id.* at 2417.

[21] The Court need not address Defendants' alternative argument that industrial consumers are not "injured" because it holds that industrial consumers are categorically not protected by the R-value Rule.

[22] The Court need not discuss whether Plaintiff can recover for foreign sales because all individual sales were domestic.

[23] Plaintiff proposes that Defendants be barred from seeking "the return of any assets." It appears Plaintiff may now concede this relief is inappropriate. Doc. 144 at 34 n.60. But to be clear, the Court will not preclude Defendants from seeking the return of assets after redress has been made to consumers. Use of any remaining funds by Plaintiff

## IV.    CONCLUSION

After review of the substantial record, the Court determines that Plaintiff is entitled to some relief, but not all it seeks. Defendants and their distributors made multiple misrepresentations about the qualities and efficacy of the products. These misrepresentations must stop. And Defendants also violated the R-value Rule, but their monetary liability for that infraction is limited because the rule protects residential customers and most of Defendants' unsubstantiated R-value claims after May 13, 2020, were about Super Therm®, which was primarily purchased by commercial and industrial customers. The Court will modify Plaintiff's proposed permanent injunction and judgment accordingly.

THE COURT THEREFORE ORDERS that Plaintiff's Motion for Summary Judgment (Doc. 130) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHERED ORDERED that Defendants' Motion for Partial Summary Judgment (Doc. 127) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Defendants owe $14,182.95 in monetary damage. A permanent injunction will also issue.

IT IS SO ORDERED.

Dated: September 22, 2022                    /s/ *Holly L. Teeter*
                                             HOLLY L. TEETER
                                             UNITED STATES DISTRICT JUDGE

---

for purposes other than consumer redress exceeds the scope of Section 19(b) of the FTC Act. *See FTC v. Figgie*, 994 F.2d 595, 607-08 (9th Cir. 1993) (explaining that requiring the defendant to pay the FTC the excess between the defendant's receipts and redress to consumers "would be for purposes of punishing" the defendant).